# Exhibit 3

```
 1  DR. GAIL REARDEN/POA              *   IN THE
 2  on behalf of her mother           *
 3  RUTHIE M. REARDEN AND NORRIS      *   CIRCUIT COURT
 4  O. REARDEN,                       *
 5  plaintiffs                        *   FOR
 6  VS                                *
 7  SINAI HOSPITAL OF BALTIMORE,      *   BALTIMORE CITY
 8  INC. ET AL.                       *
 9          Defendants                *   CASE#24-C-05-005884
10          *    *    *    *    *    *    *    *    *
11                                        September 25, 2006
12
13  BEFORE:
14          THE HONORABLE JUDGE CANNON
15
16  APPEARANCES:
17          DWAYNE BROWN, ESQUIRE, ON BEHALF OF THE
18          PLAINTIFFS
19
20          MICHAEL BAXTER, ESQUIRE,
21          ON BEHALF OF THE DEFENDANTS
22
23
24  KENNETH NORRIS
25  OFFICIAL COURT REPORTER AND TRANSCRIBER
```

1   mediation?

2   A.   That's not correct, sir.

3   Q.   Okay.  Do you recall during the mediation
4   there was a discussion about the Medicare lien in this
5   case?

6   A.   Yes, there was.

7   Q.   And the issue is whether or not you knew the
8   amount of the Medicare lien, is that correct?

9   A.   Yes, there was a discussion and Dr. Rearden
10   responded to that question.

11   Q.   But it's true at that point in time the
12   amount of the Medicare lien was not known, is that
13   correct?

14   A.   Re you waiving the attorney-client privilege
15   again, sir?

16   THE COURT: I think so.  The question was
17   asked.  You need to answer the question.

18   MR. BROWN:  I withdraw the question, Your
19   Honor.  No further questions.

20   MR. BAXTER: Just a few.

21   RE-DIRECT EXAMINATION:

22   BY MR. BAXTER:

23   Q.   Was there a discussion about the Medicare
24   lien?

25   A.   Yes, there were discussions with Judge

1    Okay.  Actually, the Court will overrule the
2    objection.  First, it appears this is related to
3    discussions that took place in front of Judge
4    Chasanow, is that correct?
5         THE WITNESS: Yes, Your Honor.  There were
6    some conversations in front of Judge Chasanow.
7         THE COURT: I think that that is what is
8    being asked about right now.  I don't know -- seems to
9    me the privilege is waived, so go ahead and ask the
10   questions about Judge Chasanow.  I don't think there
11   is a privilege as to any of them.
12        BY MR. BAXTER:
13   Q.   What were the conversations in that regard?
14   A.   In that regard, Judge Chasanow, I believe,
15   there was some discussion of the Medicare lien.  Judge
16   Chasanow said you won't know about the Medicare lien
17   and how much has to be paid until you get the
18   settlement agreement.  And he asked if we knew
19   approximately how much the lien was, and I deferred to
20   Dr. Rearden because she had been speaking about the
21   bills.  And I don't really remember what the amount of
22   the lien was, but it was for one surgery, which we
23   were trying to position the case that the corrective
24   surgery at the Mayo Clinic would have been the amount
25   Medicare would have been -- should receive based on

1  the corrective surgery.  We did not believe the
2  bleeding would have been a corrective measure at that
3  time.
4      Q.  Was it your understanding, and discussed
5  with your client, that whatever the amount was, that
6  that amount would have to be satisfied, the Federal
7  government would have to be paid, and those moneys
8  would come out of the settlement payments in this
9  case?
10     A.  No question, I told them a lawyer can be
11 disbarred for distributing that money.
12     Q.  You told them that and they appeared to
13 understand?
14     A.  Yes.
15         MR. BAXTER: Nothing further.
16         THE COURT: Anything further?
17         MR. BROWN: No.
18         THE COURT: You may step down.
19         Any further witnesses?
20         MR. BAXTER: No.
21         THE COURT: Any witnesses for the Plaintiffs?
22         MR. BROWN: Yes, Your Honor.
23         THE COURT: Go ahead.
24         MR. BROWN:  We call the Plaintiff, Gail
25 Rearden, to the stand.

1  be interested in two million-dollars? And I told him,
2  Judge Chasanow, I can't entertain two million-dollars
3  because we don't have the Medicare lien, for one
4  thing. At that point, Mr. Huskey had asked -- he had
5  asked Mr. Huskey what's the Medicare lien? Mr. Huskey
6  said, well, I don't know what it is. Dr. Rearden, do
7  you have -- he didn't ask me if he had the Medicare
8  lien because Mr. Huskey knew we didn't have the
9  Medicare lien at that time. At this point we still
10 don't have the Medicare lien. I shared with Judge
11 Chasanow, I said, I read something about the Medicare
12 lien, but all I can tell you is the approximate total
13 cost of pay-out for medical care is upwards of 600 to
14 700 thousand dollars. So, at this point, I'm telling
15 you I know it can't be any more than 700 thousand
16 dollars, which is why I can't accept two
17 million-dollars because that would leave nothing for
18 the Plaintiff, who is my mother, and her needs
19 supercede what would be left for her times 10.
20     Q.    So, did there come time when Judge Chasanow
21 came back and said anything, and said something about
22 a two million-dollar offer or settlement or anything
23 like that?
24     A.    He came back and said the hospital can't go
25 any further today. They can't talk anymore because

1  telephone postponing a summary judgement. I
2  instructed him there was no need for us to participate
3  in postponing some judgement when we didn't have any
4  kind of settlement agreement.
5      Q.  Did your attorney explain to you that
6  Plaintiffs in medical malpractice practice cases never
7  know the amount of Medicare liens and what the
8  Medicare agency will settle for before they enter into
9  settlement? Did they explain that to you, yes or no?
10     A.  My --
11     Q.  Did they explain it to you?
12     A.  No, they did not because they were not aware
13 of that. I had a letter from my attorneys that stated
14 that it was crucial to know the Medicare lien prior to
15 going to mediation. So if that is the case, they
16 weren't aware of it either.
17     Q.  Do you have an acting background?
18         MR. BROWN: Objection.
19         THE COURT: Sustained. The question is
20 stricken.
21         BY MR. BAXTER:
22     Q.  It would be inaccurate to say, based on your
23 understanding, as to what happened in that mediation,
24 that Sinai Hospital had no authority to offer any
25 money to resolve the case, that would be inaccurate,